May it please the Court, Your Honor, James Worsh on behalf of Appellants. In this case we respectfully request that Your Honors reverse the Grants of Summary Judgment against Mr. Aldridge, Ms. Franks, and Ms. Brown. All three of them were engaged in a protest of police activity when they were, without cause or justification, pepper sprayed by Defendant Olson. I think the contours of this case are governed by some recent cases in this Court. Welch v. Dempsey, which was decided a few months ago, which was held that someone who was standing near the police videotaping them and was pepper sprayed, that a reasonable jury could find that her exercise of her First Amendment rights was a but-for cause of the use of force. So I was going to ask you, Mr. Worsh, have you had a chance to read our Laney decision that just came down a few days ago? Well, unfortunately I am a lawyer on that case, so yes I have. So how do you feel that that impacts the analysis in this case? Well, I think in Laney you have a very different situation. I think the Court emphasized that you had a person who was behind a police barricade, who was rapidly approaching officers, who had his arms out towards the bike of a police officer, and that under those circumstances a reasonable officer could say that that one person was threatening the officer and that the use of pepper spray under those circumstances was appropriate. That situation is not presented here. There's no person who's behind a barricade. There's no tussling with bikes, no force being used between officers. At best you have a person who's engaged in heated discussion with one of the officers, and that's not one of the three people. We'll be talking about him later this afternoon or later this morning. So I would agree that the facts here are very different, but how would you respond to the argument that video evidence shows that in this case Officer Olson deployed the pepper spray in response to a shout from the crowd and not in response to anything that Mr. Aldridge did? I would say that that's not what Officer Olson says. In his deposition testimony he never mentions the issue of this shout, of the shut this down, that's stated there. He stated very clearly in his deposition that his intention was to target Mr. Brandy and to disperse the crowd. He never mentions this issue of the person who yelled that out. So you're saying that that's a jury issue as to but-for causation? Yes, Your Honor. Well, we're going to talk about Mr. Brandy a little bit more in a few minutes, but let's assume for purposes of argument that he was directing the pepper spray at Brandy and that he was doing it because of the cursing and statements that Mr. Brandy was making. What's your response to the argument that the other three people that you're representing, they were, I don't want to say innocent bystanders to the pepper spray, but they were just bystanders and it was not directed at them in retaliation? Well, I would point Your Honor to the video and I would also point Your Honor to the decision in Laney. One thing you notice in Laney, if you watch that video, is that the officer there goes up to Mr. Laney, pepper sprays him in the face and moves on. That's not what Officer Olson did in this case. Officer Olson pepper sprays Mr. Brandy and Mr. Aldridge, but then proceeds to walk into the crowd and start indiscriminately pepper spraying a bunch of people, including the three of them, including a woman who's in a wheelchair. I mean, he was not, this was not incidental after spray. This was not merely just misdirecting it or somehow getting some hitting people behind him. He actively uses a sweeping motion to spray everyone who's in front of him, all of whom are protesters. Well, that brings up the issue of sometimes described as targeting. Here, Mr. Aldridge had an interaction with Officer Olson. There were words exchanged. He was obviously aware of his presence, but that's not true of the other appellants, is it? No, but I would, Your Honor, under these circumstances where you have people who are actively protesting police behavior and who are responding to violence that was used against a minister in the minutes before this. And they are there standing, they're questioning the police tactics collectively, and they are there collectively protesting those actions. And they are all there as part of the protest. He, I mean, whether or not it's going through his mind, this person, this person, this person, he is looking at this crowd of protesters and he is intentionally spraying everyone who's in front of him. He's targeting everyone who's there because they are protesters. So I would emphasize again, unlike some of the other decisions by this court, in this case, there's no circumstances where the crowd is throwing objects. There's no violent behavior. In addition, I think we also have to look at Officer Olson's behavior here, that he was an aggressor in this situation. He was goading the protesters. He was moving towards them. And that shows, it's additional evidence a jury can consider of his retaliatory animus. He is itching for a fight with the various protesters. I would also direct the court's attention to the case in Greene, Megan Greene versus the city of St. Louis, which was recently decided by this court, in which the court found that Ms. Greene had submitted a submissible case when she argued that she was participating in a protest an hour beforehand and was targeted by SWAT team members in a bearcat with chemical munitions. As well for being a protester. And this court found that that was enough to submit a case. Now there's no motion to dismiss, but I compare that to the other persons you're talking about here who are part of the crowd. Again, he's targeting them. There are other people there who are at the cardinal game. He's not just aiming at anyone. He's aiming at protesters. He's aiming at these people because they are the ones who are taking the stand against the police. And he's a police officer. What's your response to the argument that a lawful command to back up was given and they refused a lawful command to back up? I would say that I think that the evidence of what the backing up is, there was some soft back up, back up. And Mr. Olson himself said, keep coming, keep coming. He was trying to goad them into coming. Regardless, there is a point prior to this happening where the protesters do stop. They're no longer advancing. I would argue take it a couple steps back. But ultimately, even if it's considered that that's a violation of the law for failure to obey, that doesn't give the officers grounds to use force. There has to be something more for them to use force. And especially in this case where it's retaliatory, the fact that whether or not they are or are not technically violating the law does not give Officer Olson the right to retaliate against these folks for exercising their First Amendment rights. I would also note that, you know, Lieutenant Jemerson, who is the head of the civilian response and disobedience response team for the city, you know, looked at this video, looked at the situation and said that he did not believe Officer Olson should have used pepper spray in the situation. That there was no reason to do so. You also see that Officer Olson is not showing fear. He's not, and the other officers are not responding in a way where they are concerned about the crowd at that point moving towards them or in that activity. You know, in all, you know, this court has repeatedly found in situations like this that when peaceful protesters are doused with chemical munitions, that defendant's motive is not so free from doubt as to justify taking this from the jury. And that's the situation that we have here. Counsel, as to Frank and Brown, doesn't there have to be at least something that the jury could look to to show that the officer knew that they were there and was somehow targeting his retaliation against them in order for that to get to a jury? I mean, in this circumstance, there is. I mean, in this circumstance, frankly, Officer Olson was simply out of control and he seemed to have a vendetta against these protesters for being there as protesters. And, you know, whether or not he specifically said, I want to go after Ms. Franks for X. I mean, in this situation where he is going into the crowd of protesters and he is going side to side, spraying everyone, he is intending to retaliate against all of them because they are there, because they are there protesting police activity, protesting what he does for a living. And I think under these particular circumstances, there is enough to show that he is retaliating against all of the people present for expressing their First Amendment rights. So I will reserve my time. All right. Thank you. Mr. Laird. All right. Thank you. You may proceed. May it please the court. Mr. Worsh, Mr. Laird. My name is Brian Milliken. I represent Officer Olson in this litigation. I would like to just address two quick points that Mr. Worsh just touched on. First of all, Mr. Olson in his deposition mentioned two real reasons for deploying mace when he did. And first was Mr. Brandy, who he perceived as a threat. But it was the crowd as well who was coming in on from the front and from his left and right. And if you look at the video, the video is very telling because just before deploying the mace, he looks to his right and his left and sprays. And at that point, his purpose was to disperse the crowd. You know, they had tried multiple times to give commands to get back, which did not work. Well, counsel, I think that kind of goes to Judge Malloy's question. It seems to me that this was an evolving situation and you could interpret the video as showing the order to get back was with regard to the arrest of I think it was Mr. Kennedy. And that once that situation was secured, does that order to get back just go on in perpetuity? Well, Your Honor, over a period of 54 seconds, there were eight commands to get back, at least that we could hear on the video. So it wasn't just one command to get back. And the other thing that you have to understand is that during this time, there was a barricade at, I believe that was Walnut, Broadway and Walnut, which prevented the officers from backing up. Not that they're required to under the law, but they couldn't back up. There was also traffic on that roadway. So as more and more protesters, and we counted up to 50 at one point that was coming back to that intersection, they had no choice. And you either obey and back up or stop at least advancing or police officers have to take action at that point. What about the fact that Olson was, he was advancing on the protesters and the other police officers were trying to hold him back? Well, I think at one point he did take a step or two forward towards back towards where the protesters were. But again, there was very little room where they had taken those gentlemen into custody. You've got other policemen directly behind him. And so they have every, you know, just for officer safety purposes, they need to try to create room. And the room was back up, back up. They gave numerous commands, not just officer Olson, but other officers as well gave numerous commands to back up. Counsel, I'd like to, in the interest of time, go back to what I see as a sort of a threshold question that we haven't addressed. In the First Amendment retaliation claim, the retaliatory conduct doesn't need to be actionable in itself, such as excessive force. So didn't the district court here err in applying the Fourth Amendment standard to a First Amendment claim? And where does that leave us? And I think you're speaking just of Aldridge, is that correct, Your Honor? Yes. You can't also then find that he retaliated for a person exercising their First Amendment right to speak. I'm not sure that's correct under Cody versus Weber. Judge, I mean, I, I haven't, I'd have to go back and look at that case. But again, I don't see how... In other words, if the retaliation involves force that's not excessive, it could still be actionable under the First Amendment, if not under the Fourth. But if a police officer is acting in retaliation, I don't think you can also find that that's reasonable, objectively reasonable. I think those two things are mutually exclusive. Well, there's two different tests. I'm sorry? There are two different tests under the various amendments. Again, I think that the way I read Judge Clark's opinion, that's what he was essentially finding that, hey, I think that in looking at the totality of the circumstances, he acted reasonably, and therefore there could be no retaliation or violation. That's what he held. I'm just questioning whether that's consistent with Cody versus Weber. I can't answer that question, Judge. I'd have to go back and review that case. I think that the other part of this is, you know, I think we've covered the third element of the First Amendment violation analysis, which is basically retaliation. I do want to say, though, that that is the appellant's burden to prove that. But the second part of this is that there is no case that would clearly establish prior to this incident occurring that what Officer Olson did was a violation of a constitutional right. If you look at the cases that are cited by appellants, none of them involve the particularized facts of this case. The case that we have cited, Bernini, I think is most appropriate because in that case, you've got officers telling the protesters it's a protest situation. You've got officers telling them to get back. They refuse to get back, and they deploy nonlethal munitions, including pepper spray. And so I think that that case illustrates, even though it's not Olson's burden to prove, that there was clearly established law. But I think that the clearly established law in the case indicates that once a protester refuses the reasonable command of an officer to get back, and I think at that point, it's no longer lawful, it's no longer peaceable, and it's no longer protected speech. Mr. Milken, would you like to save the rest of your time? Yes, sir. Thank you. Thank you, Your Honor. Mr. Wersch, Mr. Milken, my name is Brandon Laird. I represent the city of St. Louis and Commissioner Hayden. Essentially, our argument is that this court should affirm each of the three district court findings that because there was no constitutional violation, that there cannot then therefore be any Lonell liability against the city. And then to affirm, I believe, the unchallenged claims that Commissioner Hayden is entitled to qualified immunity on the failure to intervene claims. Our position is very similar to that of Officer Olson's in that there was no First Amendment violation because essentially there was no First Amendment activity. How can you say there was no First Amendment activity? Well, because it was an unlawful assembly. It was already found that way. Prior to the summary judgment, Officer Olson was charged and tried in a criminal matter arising out of this very incident, out of that use of pepper spray. And the judge in that case, in a bench trial, had a finding of fact that the assembly itself was no longer lawful once the individuals were failing to obey commands of the officer. Are you arguing that that finding is binding on us? I'm not arguing that it's necessarily binding. But it's not necessarily binding, I guess, as a matter of law. But when you have one judge looking at the same exact facts and finding that it is an unlawful assembly and that there is no protected activity, I think that that's extremely persuasive that he was looking at the same record. I also think that the activity of Mr. Brandy, which I know we're going to get into later, plays into this and that the threats being made by Mr. Brandy towards Officer Olson and with the individuals, particularly Mr. Aldridge, who was standing right next to Mr. Brandy at the time of these threats being made, and then the other two appellants who arrived sometime later, failing to, you know, hearing these threats, must have been able to hear these threats involuntarily standing next to that person while disobeying lawful orders of the officer, take it outside of the protections of the First Amendment. Counsel, you're characterizing the statements as threats, but it's my understanding that whether they were threats or not would be a jury issue. That would be a legal issue, because whether or not it's a threat, then it's not protected activity. And that has to be decided by the court, and that comes down from... What if it's a conditional threat? I still think it takes it outside of the... I still think it's unprotected activity. I don't know how you can make a conditional threat to a police officer in the middle of a protest. Well, one of the factors in determining whether something's a threat or not is whether it's conditional. Yes, but you also have to look at how it was received by the officer and the other circumstances surrounding it, whether or not he had the ability to carry it out, whether or not it was directed at the person who was there. I think that is one of the elements that you would look at for whether or not it's a true threat versus whether or not it's, I suppose, conditional. Well, it seems to me that works against your argument if you say how it was perceived, because the officer says, after Brandy says, I'm going to F you up, he says, come and F me up, and then he advances. So he obviously wasn't feeling very threatened at that point. Well, I think that that actually goes towards whether or not he thought Mr. Brandy could do something. I mean, he wouldn't say, I don't know that he was afraid Mr. Brandy was going to win the fight, but I certainly think he thought there was a chance Mr. Brandy was going to do it. So why would he taunt him and advance on him then? Well, but I don't know whether or not Officer Olson taunted him doesn't change whether or not what Mr. Brandy said was a threat, and whether or not that statement was a threat is the protected activity in question. So once Mr. Brandy offers that threat, his behavior is now taken outside the protections of the First Amendment. Whether or not Officer Olson egged it on or engaged it does not affect the protections offered to Brandy under the First Amendment analysis. The second point to address the issue brought up on Mr. Milliken's argument regarding the Fourth Amendment standard being applied in the Aldridge case to the First Amendment claims. The way that, and I addressed this in my brief, the way that I square that with Cody and other cases referenced by the Cody case, including Madewell, Sprouse, and Wright, is that there was no specific finding in those cases that the actions by those, first of all, all of those cases come out of a prison or an inmate setting. Those are all actions taken by corrections officers who are doing things like searches of cells or things with access to particular procedures of inmates. And second, there was no finding in any of those cases that the actions by the defendants were reasonable. They were just simply saying, look, the action, the act of searching a cell in a prison in and of itself is not a constitutional violation. But when you're doing it in retaliation for having done something, then it puts it within the First Amendment realm. Counsel, what does the concept of reasonableness have to do with the First Amendment? Well, if an action is, the very test for determining whether something is reasonable is to look at the full totality of the circumstances, everything that's going on at that time. So if something, looking at all of those circumstances, the fact that you were at a protest, the fact that people were shouting at you, the fact that there were potentially arguably threats being made towards you, that people are not obeying commands to back up, when you're looking at the full totality of the circumstances... Isn't that analyzed under the third factor in a retaliation claim, which is the constant connection? Yes, it is. It is under the third claim. And I think that's why if you find that it's reasonable, if you find looking at all of these, the entire circumstances... But it's a different test. But how can they be, how can something be both a reasonable, how can a person objectively act reasonably and still violate the Constitution? What's your best case that so holds, that applies the reasonableness in the First Amendment context? There isn't one. There isn't one that directly addresses that on point. And that's part of the issue that I've had in briefing some of these cases is trying to square that, of trying to figure out, particularly in this case, if you do believe, if the judge did look at this and find, as a matter of law, that he acted objectively reasonable, how can it then, looking at the totality of the circumstances, how can you then find that it was in retaliation for anything else? That would be, to Judge Gradget's point, that would go to the third element of retaliation, that there has to be some causation there. And I see that my time is up. Thank you, Your Honor. Mr. Wersch. Very briefly, Your Honor, I think Your Honor's targeted a few important questions here, specifically about the factual nature of whether or not this was a threat. I know we're not talking about Mr. Brandy quite yet, but as Judge Hamilton found, whether or not his speech traversed into unlawful speech or unprotected speech is a fact question for the jury. And all those things, that decision, that needs to be decided by a jury. What if we decide that we can look at the tape and what was actually said and decide it was a threat? Where does that leave us? Well, as to Mr. Brandy, there might be an issue. If you find in a matter of law that it's a threat, we would strongly argue against that for the factors that the court has already observed, that it was not a serious threat. It was also a conditional threat. And the actions of Officer Olson show that he did not believe it was a real threat. Otherwise, he would not have advanced on him and he would not have continued to goad him. That's not the activities of a person who feels threatened. But as far as the three people who are in front of you right now, I don't think it has any effect because, again, this isn't a situation where there was a simple after spray or someone was behind Mr. Brandy. This is a situation where Officer Olson steps into the crowd and sprays side to side, targeting various protesters. And on that end, Mr. Milliken said that here. Your Honor's had a question about whether or not there's enough evidence in the record that he targeted them. But Mr. Milliken got up here and said that one of the rationale that he had was to target protesters. His stated rationale was to get them to disperse. But Officer Olson definitely was targeting more than one person in this crowd. He was targeting the protesters to get them to go away. And we believe the evidence supports the inference that he did that for retaliatory reasons. Mr. Milliken also mentioned stuff about the barricade and things like that that I think are certainly things he can argue at trial. I would also just note again that the head of the CDT team here, Lieutenant Jemerson, who's much more well-versed in the operations of crowd control and crowd response, he's the one in charge of this whole operation, did not believe that the circumstances warranted the actions that were taken by Officer Olson. So if reasonable police officers can disagree about that, then certainly that's something that needs to be resolved by a jury. Counsel, I'd like to revisit the argument that this was an unlawful assembly, and that once the order to back up had been given, there was illegal activity taking place. And so therefore, there was no First Amendment activity. Where's the line there? Where do these orders to back up, how far do they go? Well, I think an unlawful assembly requires, under the state and local ordinance, requires that there be six or more people acting in concert to engage in violent activity. And so under those standards, there's not an unlawful assembly here. There's people who walked from one place to another, and they stopped. I think the evidence is very contradictory whether or not they were continuing to advance. I think the video shows people stopping and just expressing their anger at what happened. And so I don't think that there was an unlawful assembly, and I think that line hasn't been crossed here. You have people who were simply observing. Some people were saying things. Everyone was there to observe the police and ask the question collectively why they did what they did to Reverend Gray and Mr. Kennedy. So I don't think we get into an unlawful assembly. This is not like Bernini where you have actually throwing objects, a violent crowd actively pushing towards the police, being warned to stop, and they keep approaching the police. Again, they did stop here, and there's just not evidence of an unlawful assembly here. That's my time. Thank you. We appreciate your arguments, and the case is submitted.